1                    UNITED STATES DISTRICT COURT

2                  FOR THE WESTERN DISTRICT OF TEXAS

3                        U.S. MAGISTRATE JUDGE

4                          EL PASO DIVISION

5    UNITED STATES OF AMERICA )No. EP:18-M-0291(1)-MAT

6    vs.                     )El Paso, Texas

7    JENY LILIANA            )
     AMADOR PONCE            )January 19, 2018
8    _____

9

10                    PRELIMINARY/DETENTION HEARING

11               Before the Honorable Miguel A. Torres

12

13   A P P E A R A N C E S:
     ----------------------
14   FOR THE GOVERNMENT:

15   MR. CHRISTOPHER MANGELS
     -----------------------
16   Assistant United States Attorney
     700 E. San Antonio
17   El Paso, Texas 79901

18

19   FOR DEFENDANT:

20   MR. MANUEL ACOSTA
     --------------------------
21   700 E. San Antonio Avenue, Suite D-401
22   El Paso, Texas 79901

23

24      Proceedings reported by stenotype.  Transcript produced by

25   computer-aided transcription.

```
 1              THE COURT:  The Court calls EP:18-M-291, the
 2   United States of America versus Jeny Liliana Amador Ponce.  We
 3   are here for a prelim and detention.
 4       May I have announcements, please.
 5              MR. MANGELS:  Good morning, Your Honor,
 6   Christopher Mangels for the United States, ready.
 7              THE COURT:  Good morning.
 8              MR. ACOSTA:  Good morning, Your Honor, Manuel Acosta
 9   for Ms. Amador Ponce.  We are ready as well.
10              THE COURT:  Good morning.  Go ahead and call your
11   first witness.
12              MR. MANGELS:  Thank you, Your Honor.  The
13   United States will call Amanda Hunt to the stand.
14              THE COURT:  Good morning.  Do you swear to tell the
15   truth, the whole truth, and nothing but the truth so help you
16   God?
17              AGENT HUNT:  I do.
18              THE COURT:  Have a seat, Agent Hunt.  You may proceed.
19              MR. MANGELS:  Thank you, Your Honor.
20       Good morning.
21              AGENT HUNT:  Good morning.
22              MR. MANGELS:  Can you please state your full name and
23   spell your last name for the record?
24              AGENT HUNT:  Amanda Hunt, H-u-n-t.
25              MR. MANGELS:  How are you employed, Ms. Hunt?
```

1           AGENT HUNT:  I am a Customs & Border Protection
2    officer with the Department of Homeland Security.
3           MR. MANGELS:  How long have you been working for
4    Homeland Security?
5           AGENT HUNT:  Approximately 29 years.
6           MR. MANGELS:  Are you familiar with a case involving
7    Jeny Liliana Amador Ponce?
8           AGENT HUNT:  Yes.
9           MR. MANGELS:  Do you see Ms. Amador in the courtroom
10   today?
11          AGENT HUNT:  Yes, she is seated next to counsel,
12   Mr. Acosta.  She is wearing the El Paso County Detention jumper
13   suit, blue jumper suit.  Her hair is braided.
14          MR. MANGELS:  Thank you.
15      Your Honor, can we have the record reflect the in Court
16   identification of Ms. Amador?
17          THE COURT:  The record will so reflect.
18          MR. MANGELS:  Thank you, Your Honor.
19      Agent Hunt, how did Ms. Amador first come to the attention
20   of law enforcement on January 13th of this year?
21          AGENT HUNT:  She applied for admission to the
22   United States at the Paseo Del Norte Port of Entry in
23   El Paso, Texas.  The Defendant was accompanied by her minor son
24   and four other individuals whom she claimed were her minor
25   cousins.

1          MR. MANGELS:  The Paseo Del Norte Port of Entry, is

2     that within the Western District of Texas?

3          AGENT HUNT:  Yes, it is.

4          MR. MANGELS:  What happened when she applied for

5     entry?

6          AGENT HUNT:  CBP Officer Bakistini, I don't know if I

7     pronounced it correctly, asked the Defendant if they had

8     documents -- a passport or a visa, and she stated that she and

9     the children were requesting political asylum.

10         MR. MANGELS:  What happened at that point?

11         AGENT HUNT:  He escorted them to passport control

12    secondary for further inspections.

13         MR. MANGELS:  What occurred in secondary?

14         AGENT HUNT:  In passport control secondary,

15    Officer Jalot while conducting the secondary inspection noticed

16    that one of the minor males who was later identified as TOG, a

17    citizen of Honduras, looked older in comparison with the other

18    males.

19         MR. MANGELS:  Did the officer speak with this

20    individual?

21         AGENT HUNT:  Yes, he did.

22         MR. MANGELS:  What did the officer ask and how did the

23    individual respond?

24         AGENT HUNT:  Officer Jalot asked the minor male how

25    old he was, TOG, and he stated 17, but, upon further

1    inspection, TOG admitted his true name and date of birth and

2    admitted to being 21 years of age.

3            MR. MANGELS:  Did he say anything else about why he

4    was coming to the United States?

5            AGENT HUNT:  He said he wanted to come work.

6            MR. MANGELS:  Did he say how he had come to be in the

7    company of these other individuals and how he had actually

8    gotten to the United States?

9            AGENT HUNT:  He stated that the Defendant was paid

10   12,500 US dollars to have them all smuggled from Honduras. He

11   stated that his sister had paid the Defendant $1,500 to have

12   them smuggled into the US.  He stated that the Defendant was

13   aware that he was not a minor, also was aware that he was going

14   to attempt to enter the United States by representing himself

15   to be a minor, and that he was going to use a birth certificate

16   that did not belong to him.

17       In addition to the $1,500 TOG's sister paid the Defendant,

18   she also gave her $1,000 to pay -- to be paid to another

19   smuggler.

20           MR. MANGELS:  So, just to clarify a little bit about

21   the monetary amounts that are being paid here.  This individual

22   stated his sister paid $12,500 just in total for all of the

23   individuals?

24           AGENT HUNT:  Correct.

25           MR. MANGELS:  And 1,500 of this money was for him

1   specifically?

2          AGENT HUNT:  She doesn't specify if 15 came out of

3   that amount or it was an additional 15.

4          MR. MANGELS:  But there was an additional $1,000 that

5   the sister paid to the Defendant that was going to go to

6   another smuggler?

7          AGENT HUNT:  Correct.

8          MR. MANGELS:  Were agents able to talk with the

9   Defendant as well?

10          AGENT HUNT:  They did.

11          MR. MANGELS:  What did she say?

12          AGENT HUNT:  She stated and admitted to being a

13   citizen of Honduras, admitted to not having documents to enter

14   the United States.  She also -- the companions with her were

15   minors and that Officer Villesco asked her how are you related

16   to the children.  That's when she stated one of the children is

17   my son and the other ones are related to me.  She stated she

18   was going to reimburse TOG's sister $5,000 of the 12,500 she

19   paid a smuggler to bring them from Honduras.

20          MR. MANGELS:  Did she say anything about her

21   relationship or her familiarity with TOG?

22          AGENT HUNT:  She only stated that they were -- she

23   stated that TOG's aunt was her -- she was -- TOG's

24   sister-in-law and aunt was her sister-in-law.  It is how they

25   were related.

1          MR. MANGELS:  There was a familial relationship she

2   claimed between her and TOG?

3          AGENT HUNT:  She claimed.

4          MR. MANGELS:  Were agents able to look into the

5   relationships between the Defendant and TOG and the other minor

6   children that were there?

7          AGENT HUNT:  I spoke to Officer Jalot and asked him do

8   you know how, in fact, the minors that were coming with her

9   were related to her, and he stated no, they were not.

10         MR. MANGELS:  Any of the children belong to her?  Were

11  any of them her children?

12         AGENT HUNT:  Just the one, her son.

13         MR. MANGELS:  One of the children was her son?

14         AGENT HUNT:  Yes.

15         MR. MANGELS:  And there were four other individuals,

16  three of which were minors?

17         AGENT HUNT:  Correct.

18         MR. MANGELS:  The one who was not a minor was TOG?

19         AGENT HUNT:  Correct.

20         MR. MANGELS:  Of the four individuals, Officer Jalot

21  was able to determine that none of them had any relation to the

22  Defendant?

23         AGENT HUNT:  Correct.  He told me they were not

24  related.

25         MR. MANGELS:  The other three minors other than her

1   child, the three minors, were any of them United States

2   citizens?

3           AGENT HUNT:  No; they were all citizens of Honduras.

4           MR. MANGELS:  Did any of them have legal documentation

5   to enter the United States?

6           AGENT HUNT:  None of them did.

7           MR. MANGELS:  No further questions.  Thank you,

8   Your Honor.

9           THE COURT:  Mr. Acosta?

10          MR. ACOSTA:  May it please the Court, Your Honor.

11          THE COURT:  Yes, sir.

12          MR. ACOSTA:  Ms. Hunt, if I ask you something that I

13  make it confusing or you don't understand my question, can you

14  just ask me to repeat?

15          AGENT HUNT:  I will.

16          MR. ACOSTA:  Thank you, Ms. Hunt.

17          AGENT HUNT:  You're welcome.

18          MR. ACOSTA:  You mentioned you had been working in

19  this capacity vis-a-vis Border Patrol and Department of

20  Homeland Security for about 29 years; is that correct?

21          AGENT HUNT:  CBP port of entry.  29 years total with

22  immigration and when we merged Customs & Border Protection,

23  yes.

24          MR. ACOSTA:  You are the head agent involved in this

25  case?

1              AGENT HUNT:  The case agent involved with the case,

2      yes.

3              MR. ACOSTA:  You were able to talk to all the

4      witnesses in this case?

5              AGENT HUNT:  No; only Officer Jalot.

6              MR. ACOSTA:  You did not talk to Bakistini?

7              AGENT HUNT:  No, I did not.

8              MR. ACOSTA:  You did talk to Jalot?

9              AGENT HUNT:  Yes, I did

10             MR. ACOSTA:  Did you talk to any of the minors that

11     were detained at the bridge?

12             AGENT HUNT:  No, sir.

13             MR. ACOSTA:  Who talked to the minors?

14             AGENT HUNT:  I don't know who spoke.  I don't know who

15     spoke to the minors.

16             MR. ACOSTA:  Well, were there four people who arrived

17     at the bridge including my client or five people including my

18     client?

19             AGENT HUNT:  No, it was -- let's see.  The Defendant,

20     her son, TOG so there was a total of six.

21             MR. ACOSTA:  Let's talk about my client's interview

22     with Mr. Jalot; is that okay?

23             AGENT HUNT:  Sure.

24             MR. ACOSTA:  Was that interview recorded?

25             AGENT HUNT:  No, sir.

1          MR. ACOSTA:  Mr. Jalot did not record the interview

2  with my client?

3          AGENT HUNT:  No, sir.

4          MR. ACOSTA:  Did my client's interview happen after

5  Jalot talked to TOG?

6          AGENT HUNT:  After -- I don't know if it did or not.

7          MR. ACOSTA:  Well, he was asking about the

8  relationship and the money to my client, correct?

9          AGENT HUNT:  Yes, sir.

10          MR. ACOSTA:  And Jalot is saying that TOG told him

11  about the relationship and the money, correct?

12          AGENT HUNT:  Yes.

13          MR. ACOSTA:  So, it follows logic that he first talked

14  to TOG before talking to my client?

15          MR. MANGELS:  Objection; argument, asked and answered.

16          THE COURT:  Overruled.

17          AGENT HUNT:  Yes.

18          MR. ACOSTA:  So, Mr. Jalot already had an idea this

19  could be a smuggling case after he talked to TOG, correct?

20          AGENT HUNT:  Well, after he spoke and got the

21  information, he knew, yes, this was a smuggling case.

22          MR. ACOSTA:  So, once he goes to talk to my client,

23  then Officer Jalot informed my client of her rights before the

24  interview?

25          AGENT HUNT:  I don't know who served if Officer Jalot

1    actually served the Defendant her Miranda Rights.  May I look?

2              MR. ACOSTA:  Please.

3              AGENT HUNT:  It was Officer Villegas.

4              MR. ACOSTA:  And Officer Villegas at the same time he

5    gave my client her Miranda warnings?

6              AGENT HUNT:  11:51 on January 13th -- say the time --

7              MR. ACOSTA:  My client initialed and signed the

8    warnings?

9              AGENT HUNT:  No.  She requested an attorney.

10             MR. ACOSTA:  After my client requested an attorney,

11   Officer Jalot proceeded to interview my client; is that

12   correct?

13             AGENT HUNT:  He first initialed -- was talking to TOG.

14   Then he found out that she was going to get paid, and then they

15   served her her Miranda Rights.  They served her her

16   Miranda Rights after they found out about the money exchange

17   and her bringing them to the US.

18             MR. ACOSTA:  I understand.  Let me clarify if I may.

19   So, Officer Jalot talked to TOG, correct?

20             AGENT HUNT:  Correct.

21             MR. ACOSTA:  And TOG was not served any Miranda

22   warnings; is that correct?

23             AGENT HUNT:  After the fact, he was.

24             MR. ACOSTA:  After they talked to him?

25             AGENT HUNT:  Correct.

1          MR. ACOSTA:  And after they talked to him,

2    Officer Jalot talked to him, he understood it was a smuggling

3    case, correct?

4          AGENT HUNT:  Yes.

5          MR. ACOSTA:  And then they served my client with her

6    Miranda warnings, correct?

7          AGENT HUNT:  Correct.

8          MR. ACOSTA:  And, at some point, somebody after you

9    served the Miranda warnings, then they talked to her about the

10    case?

11          AGENT HUNT:  Yes.

12          MR. ACOSTA:  And they talked to her, and she says

13    about the relationship between her and TOG?

14          AGENT HUNT:  Yes.

15          MR. ACOSTA:  And then she talks about being reimbursed

16    or going to reimburse somebody for $5,000?

17          AGENT HUNT:  Correct.

18          MR. ACOSTA:  And then she says the relationship with

19    TOG is that the aunt is the sister-in-law so there is a

20    familial relationship, correct?

21          AGENT HUNT:  Yes.

22          MR. ACOSTA:  And all of that is happening while she

23    already requested an attorney, correct?

24          AGENT HUNT:  I don't know if that happened after,

25    before.  I don't know.

1          MR. ACOSTA:  What we do know is this Officer Jalot

2   already knew after talking to TOG this was going to be a

3   smuggling case, correct?

4          AGENT HUNT:  Correct.

5          MR. ACOSTA:  Based on your experience and training --

6   let's talk about your experience.  There are several ways

7   somebody can enter the country illegally, correct?

8          AGENT HUNT:  Correct.

9          MR. ACOSTA:  And the port director has authority to

10  allow people to come into the country as well?

11         AGENT HUNT:  The port director?

12         MR. ACOSTA:  Yes.

13         AGENT HUNT:  The service, yes, has the authority to

14  allow people to come in.

15         MR. ACOSTA:  In this particular case on January 13th,

16  we had six people who arrived at the port of entry, correct?

17         AGENT HUNT:  Correct.

18         MR. ACOSTA:  Those people went directly to the first

19  officer they found at primary, correct?

20         AGENT HUNT:  Correct.

21         MR. ACOSTA:  And the primary officer requested a

22  document?

23         AGENT HUNT:  Yes.

24         MR. ACOSTA:  None of them had any documents to enter

25  legally at that point, correct?

1          AGENT HUNT:  Correct.

2          MR. ACOSTA:  That does not disqualify them from

3     seeking permission to enter, correct?

4          AGENT HUNT:  Correct.

5          MR. ACOSTA:  I think you testified that they were

6     actually doing that, applying for admission at that point?

7          AGENT HUNT:  Yes, they were.

8          MR. ACOSTA:  There is nothing illegal in applying for

9     admission, correct?

10         AGENT HUNT:  Correct.

11         MR. ACOSTA:  The way they all applied for admission

12    through my client was requesting political asylum?

13         AGENT HUNT:  Yes.

14         MR. ACOSTA:  That is legal.  Somebody can come to the

15    bridge and request political asylum?

16         AGENT HUNT:  Yes, sir.

17         MR. ACOSTA:  No illegality has happened at that point,

18    correct?

19         AGENT HUNT:  Correct.

20         MR. MANGELS:  Your Honor, I will object to the last

21    question and answer.  It calls for speculation and a legal

22    conclusion which I don't think this Agent is qualified to give.

23         THE COURT:  I will overrule that.

24         MR. ACOSTA:  My client received money according to

25    TOG, right?

1               AGENT HUNT:  Yes.

2               MR. ACOSTA:  To move herself and the other individuals

3    all the way from Honduras to El Paso?

4               AGENT HUNT:  No.

5               MR. ACOSTA:  What was the money for?

6               AGENT HUNT:  This TOG stated his sister had paid an

7    unknown smuggler to bring them from Honduras, but the sister

8    had paid her $1,500 to smuggle them into the United States.

9               MR. ACOSTA:  You would agree with me that based on the

10   facts of this case that there was no smuggling into the

11   United States happening?

12              MR. MANGELS:  Objection.

13              THE COURT:  The objection being?

14              MR. MANGELS:  Calls for a legal conclusion.

15              THE COURT:  Mr. Acosta?

16              MR. ACOSTA:  Well, the Government presented that my

17   client was going to smuggle somebody.  I am asking that based

18   on the facts we have in this case, nobody has been smuggled at

19   this point.

20              MR. MANGELS:  It is also argument, Your Honor.

21              THE COURT:  Also what?

22              MR. MANGELS:  Argument.

23              THE COURT:  I will overrule the objection.  Ask your

24   question again.

25              MR. ACOSTA:  Thank you, Your Honor.

1      So, at the point my client arrives at the bridge asking for

2   political asylum -- which you said was legal, correct?

3            AGENT HUNT:  Yes.

4            MR. ACOSTA:  She didn't attempt to smuggle anybody?

5            AGENT HUNT:  She did attempt to smuggle somebody.

6            MR. ACOSTA:  Now, she asked for political asylum,

7   correct?

8            AGENT HUNT:  Correct.

9            MR. ACOSTA:  At that point, it was completely legal?

10            AGENT HUNT:  Yes, sir.

11            MR. ACOSTA:  She asked for political asylum and asylum

12   for five other individuals?

13            AGENT HUNT:  Yes.

14            MR. ACOSTA:  And that is legal?

15            AGENT HUNT:  Yes.

16            MR. ACOSTA:  Is there an age limit for somebody to ask

17   for political asylum?

18            AGENT HUNT:  No, sir.

19            MR. ACOSTA:  My client, although she is not a minor,

20   can ask for political asylum?

21            AGENT HUNT:  Correct.

22            MR. ACOSTA:  So, when she is asking for political

23   asylum for TOG, was that illegal?

24            AGENT HUNT:  No.

25            MR. MANGELS:  Objection again, Your Honor.

```
 1              THE COURT:  Overruled.
 2              MR. ACOSTA:  Now, TOG is questioned about his age?
 3              AGENT HUNT:  Yes.
 4              MR. ACOSTA:  Because he presented a birth certificate
 5    that may be fraudulent or may not be his; is that correct?
 6              AGENT HUNT:  Yes.
 7              MR. ACOSTA:  And it was his father, TOG's father, who
 8    provided that document; is that correct?
 9              AGENT HUNT:  Yes.
10              MR. ACOSTA:  TOG never said the document was related
11    to my client?
12              AGENT HUNT:  No.
13              MR. ACOSTA:  And TOG never said my client said you
14    should use this document?
15              AGENT HUNT:  No.
16              MR. ACOSTA:  This was TOG's decision, correct?
17              AGENT HUNT:  Yes.
18              MR. ACOSTA:  You agree that when my client was asked
19    at the bridge that she stated we are here for political asylum?
20              MR. MANGELS:  Asked and answered.
21              THE COURT:  Sustained.
22              MR. ACOSTA:  The money that was actually supposedly
23    paid by TOG's aunt?
24              AGENT HUNT:  Sister.
25              MR. ACOSTA:  That money was for what?
```

1            AGENT HUNT:  To smuggle them into the US.

2            MR. ACOSTA:  Well, there is no evidence whatsoever

3    they had attempted to cross through the river or anything like

4    that, correct?

5            AGENT HUNT:  Correct.

6            MR. ACOSTA:  All the evidence is they went directly to

7    the bridge [inaudible], correct?

8            AGENT HUNT:  Correct.

9            MR. ACOSTA:  Your Honor, I will pass the Witness,

10   thank you.

11           THE COURT:  Mr. Mangels?

12           MR. MANGELS:  Briefly, Your Honor, thank you.

13           THE COURT:  Yes, sir.

14           MR. MANGELS:  Agent Hunt, reading your affidavit and

15   hearing your answers to the questions by Defense counsel, I

16   wanted to clarify a little bit about the questions that were

17   asked of the Defendant and the Miranda warnings.

18      When did the Defendant first -- what time did she first

19   apply for entry at the Paseo Del Norte Port of Entry?

20           AGENT HUNT:  Officer Bakistini, his memo stated at

21   11:58.  Can I double check?

22           MR. MANGELS:  Absolutely.

23           AGENT HUNT:  He puts approximately 11:58 a.m.

24           MR. MANGELS:  You said on the rights advisement form.

25   What time were the rights advisement, according to that form,

1  given to the Defendant?

2         AGENT HUNT:  The Miranda Rights?

3         MR. MANGELS:  Yes.

4         AGENT HUNT:  What time?

5         MR. MANGELS:  Yes.

6         AGENT HUNT:  They showed or indicate -- it appears

7  11:51.

8         MR. MANGELS:  That appears to be a discrepancy, right?

9         AGENT HUNT:  Yes.

10        MR. MANGELS:  Going back then.  According to your

11  affidavit, and I believe your testimony, they were questioned

12  at primary and sent to secondary, correct?

13        AGENT HUNT:  Correct.

14        MR. MANGELS:  And at secondary they were questioned?

15        AGENT HUNT:  Yes.

16        MR. MANGELS:  Following that questioning, at least how

17  I read your affidavit, was when the Miranda warnings were

18  given; is that correct?

19        AGENT HUNT:  Can you repeat the question again?

20        MR. MANGELS:  Did Officer Jalot ask any questions of

21  the Defendant after the Miranda warnings were given?

22        AGENT HUNT:  No.

23        MR. MANGELS:  Did you talk to Officer Jalot about what

24  was in his mind or what he was thinking about what was going on

25  at the time he was asking the Defendant questions?

 1          AGENT HUNT:  Um --

 2          MR. MANGELS:  Did you talk to Officer Jalot about

 3  that?

 4          AGENT HUNT:  I called him.  I actually called him at

 5  home and asked him questions regarding the case.

 6          MR. MANGELS:  Did you ask him the question that at the

 7  time he was questioning the Defendant what he thought was

 8  happening?  Not after that or any other point.  At the time,

 9  did you ask him the question at the time he was questioning the

10  Defendant what he thought was going on?

11          AGENT HUNT:  No, I didn't ask him that question.

12          MR. MANGELS:  So, for you to say that he at that time

13  knew they were smuggling, it is your speculation about what

14  Officer Jalot was thinking, correct?

15          AGENT HUNT:  Yes.

16          MR. MANGELS:  Thank you.  You had something to add?

17          AGENT HUNT:  On the top of the Miranda Rights because

18  they didn't write clearly --

19          MR. MANGELS:  Please.

20          AGENT HUNT:  It shows 11:51. In looking further down,

21  time subject or suspects advised of rights to remain silent,

22  1851.

23          MR. MANGELS:  So, 1851 is about seven hours later?

24          AGENT HUNT:  Approximately.

25          MR. MANGELS:  Like 6 o'clock at night or almost

1    7 o'clock at night?

2              AGENT HUNT:  More or less, yes.

3              MR. MANGELS:  Thank you.  Do you believe that

4    Officer Jalot waited seven hours to ask the Defendant

5    questions?

6              MR. ACOSTA:  Objection; speculation, Your Honor.

7              THE COURT:  Overruled.

8              MR. MANGELS:  I will ask the question again.

9         Do you believe that Officer Jalot waited seven hours to ask

10   the Defendant questions?

11             AGENT HUNT:  No.

12             MR. MANGELS:  Thank you.  I will pass the Witness,

13   Your Honor.

14             THE COURT:  Mr. Acosta, anything else?

15             MR. ACOSTA:  Briefly, Your Honor, just to clarify two

16   points.

17        Based on the last question, [inaudible] that Officer Jalot

18   decided to question my client without giving her her Miranda

19   warnings; is that correct?

20             AGENT HUNT:  We didn't give them.  Officer Villesca

21   served her the Miranda.  I didn't serve him or her -- excuse

22   me, her her Miranda Rights.  It was another officer.

23             MR. ACOSTA:  It is fair to conclude that Officer Jalot

24   conducted an interview of my client without anybody giving her

25   the warnings before that interview; is that correct?

1          AGENT HUNT:  He did conduct the interview and most

2    likely made the determination there was possibly an alien

3    smuggling case, and at that point they served her her

4    Miranda Rights.

5          MR. ACOSTA:  It is not what you testified.

6          AGENT HUNT:  Well, I --

7          MR. ACOSTA:  Before, you testified TOG had been

8    interviewed at first, right?

9          AGENT HUNT:  Well, they are interviewing both.  You

10   have Officer Villesca and Jalot interviewing, and they are

11   interviewing to determine, for one thing, TOG's age because he

12   appeared to be older than the other ones and --

13         MR. ACOSTA:  I understand that.  You testified that

14   Jalot interviewed TOG?

15         AGENT HUNT:  Yes, he did.

16         MR. ACOSTA:  So, we know TOG was interviewed by Jalot,

17   and based on your experience, 29 years of experience, he

18   determined it was a smuggling case?

19         MR. MANGELS:  Objection; speculation.

20         THE COURT:  Overruled.

21         MR. ACOSTA:  Then Jalot interviewed my client; is that

22   correct?

23         AGENT HUNT:  Um --

24         MR. ACOSTA:  It is not Officer Villesca, it is Jalot?

25         AGENT HUNT:  Villesca asked her -- Villesca asked her

1    citizenship, if she had documents.  He asked her about the

2    companions, the children, that were coming, and she stated to

3    Officer Villesca if the children were related to her, and she

4    said one of the children was actually her son, and the

5    remainder of the children were related to her.  Jalot -- I

6    don't see that -- the only thing Jalot asked her was how long

7    she had known TOG, and she replied her entire life.

8              MR. ACOSTA:  Now, it appears there were several

9    encounters; is that correct?

10             AGENT HUNT:  In regards to --

11             MR. ACOSTA:  To my client and the agents?

12             AGENT HUNT:  Several officers.  I don't understand.

13             MR. ACOSTA:  Encounters meaning -- my client talked to

14   the agents at primary, correct?

15             AGENT HUNT:  One agent.

16             MR. ACOSTA:  Which is the guy with the funny name?

17             AGENT HUNT:  Bakistini.

18             MR. ACOSTA:  Right?

19             AGENT HUNT:  Correct.

20             MR. ACOSTA:  And she is requesting political asylum?

21             AGENT HUNT:  Correct.

22             MR. ACOSTA:  For her and everybody in the group?

23             AGENT HUNT:  Correct.

24             MR. ACOSTA:  And at secondary is Officer Jalot that we

25   have in here, right?

 1          AGENT HUNT:  We have Officer Jalot and

 2  Officer Villesca.

 3          MR. ACOSTA:  Not Villegas which is the one who read

 4  them the Miranda warnings?

 5          AGENT HUNT:  Officer Villesca is the one who served

 6  her the rights.

 7          MR. ACOSTA:  We have Officer Villesca and Jalot at

 8  secondary?

 9          AGENT HUNT:  Correct.

10          MR. ACOSTA:  At first, Jalot interviews TOG?

11          AGENT HUNT:  Yes.

12          MR. ACOSTA:  At some point, Officer Villesca

13  interviews my client without giving her the Miranda warnings,

14  right?

15          AGENT HUNT:  I don't know that.  Officer Villesca --

16          THE COURT:  You're talking about who again?

17          MR. ACOSTA:  My client.

18          AGENT HUNT:  Um, they -- he was involved with the

19  interview with TOG.  Both Officer Villesca are present and

20  Jalot.  He states the same that she admitted to being a citizen

21  of Honduras, not having any documents, and requesting, of

22  course, the political asylum, about the children, and he states

23  the thing that Jalot stated about the birth certificate, that

24  TOG claimed to be a minor, presented a false birth certificate,

25  and he puts the same thing that -- all this money was paid to

1   an unknown coyote for the $12,500.

2       After all of that talking, he states she was served her 214

3   after conducting their interview, and then they served her.

4   Officer Villesca said he served her the 214.

5           MR. ACOSTA:  It is fair to say that Jalot and

6   Officer Villesca interviewed TOG first, correct?

7           AGENT HUNT:  I don't know if Villesca did.  He might

8   have been present.  Jalot was the one talking to him.  He might

9   have been present when this conversation so he is aware of what

10  is taking place.

11          MR. ACOSTA:  So, they do that first, correct?

12          AGENT HUNT:  Yes.

13          MR. ACOSTA:  They form an opinion as to what is

14  happening, correct?  Because they are case agents, they are

15  agents at the bridge?

16          MR. MANGELS:  Objection.  Again, I don't think the

17  Officer testified that at that point they had formed their

18  opinion according to their memorandums and speaking with them.

19  Therefore, anything for her to say about what their opinion was

20  and thoughts were would be speculation.

21          THE COURT:  Sustained.

22          MR. MANGELS:  Thank you.

23          MR. ACOSTA:  After they talked to TOG or listened to

24  TOG, Officer Villesca initiates an interview with my client

25  without reading her rights, correct?

1          AGENT HUNT:  I don't know who initiated conversations

2     with the Defendant.  In the memo appears that Villesco is the

3     one asking her or talking to her.  All she said is she was a

4     citizen of Honduras and didn't have documents, and they didn't

5     find out she was going to reimburse TOG's sister $500 for her

6     and her son.

7          MR. ACOSTA:  Pass the Witness, Your Honor.

8          THE COURT:  Anything else?

9          MR. MANGELS:  No, Your Honor.

10         THE COURT:  Actually, before you step down, I am

11     curious about this, and I will lean on the fact that you have

12     been an officer for 29 years.  Parole, is that the old -- they

13     used to call it the I-94?

14         AGENT HUNT:  The parole and the [inaudible] on a I-94

15     permit is like the same form you would use to issue a

16     nonimmigrant permit to travel.

17         THE COURT:  That's when -- Mr. Acosta, this is kind of

18     tangential issue, but I am curious about it.  When Mr. Acosta

19     asked you about what authority the port director has, they can

20     parole somebody in for a different number of purposes?

21         AGENT HUNT:  Correct.  Parole --

22         THE COURT:  Humanitarian reasons, for example?  Sorry

23     for interrupting, and prosecution sometimes?

24         AGENT HUNT:  The parole is to allow an individual to

25     come into the United States.  We are not admitting them to the

1  US.  We're allowing them to come in the prosecution case is

2  pending [inaudible] criminal case.

3          THE COURT:  So, when somebody shows up at a port of

4  entry, and it is at a port of entry, right?

5          AGENT HUNT:  Correct.

6          THE COURT:  That basically they are not allowed in --

7  let's say they are going to be prosecuted for, I don't know,

8  some 1325 offense or something, they are not allowed in at that

9  time.  They are paroled in for purposes of prosecution?

10          AGENT HUNT:  Correct.

11          THE COURT:  What document is generated by the service?

12  Is it the 212?

13          AGENT HUNT:  No, the I-94.

14          THE COURT:  The I-94?

15          AGENT HUNT:  Yes.

16          THE COURT:  Even for a criminal prosecution, they give

17  them a I-94?

18          AGENT HUNT:  Yes.  They stamp it with a parole stamp.

19          THE COURT:  I see.

20          AGENT HUNT:  And then they [inaudible] 212D5.

21          THE COURT:  212D5, and it is somebody that has not

22  completed an entry?

23          AGENT HUNT:  They are issued to people that are

24  inadmissible.  We are allowing them to come in, but we are not

25  admitting them to come in.  It is confusing.  We are allowing

1    them to come into the US, but it is not an admission to the US.

2             THE COURT:  They are here.  It is setting up a legal

3    fiction that says you didn't make it into the US, but we are

4    allowing you to come in so we can prosecute you.  It would be

5    very different if somebody was actually here and like if

6    somebody said you know what, we are claiming asylum but they

7    are found at the levy by Border Patrol.  Totally different

8    thing and parole does not apply?

9             AGENT HUNT:  I believe parole does not apply for them,

10   but I'm not sure.

11            THE COURT:  Parole applies in -- let's say somebody

12   showed up with a false document at the port of entry, and they

13   were discovered, and that's a 1028 offense at a minimum.  That

14   person would be paroled in?

15            AGENT HUNT:  Correct.

16            THE COURT:  Somebody that is found in Hudspeth County

17   or on the levy here are not paroled in because they are here,

18   correct?

19            AGENT HUNT:  I believe, Your Honor.  I am not -- I

20   believe they would not be paroled in because they are

21   [inaudible].

22            THE COURT:  I just had questions about that parole.  I

23   kind of remembered the I-94.  I just wanted to try to clear it

24   up a little bit just for my own purposes?

25            AGENT HUNT:  The I-94 is also used for permit but with

```
 1    an admission stamp for nonimmigrant.
 2              THE COURT:  I see.
 3              AGENT HUNT:  There is different stamps, and the I-94
 4    is used to parole with the parole rubberstamp.
 5              THE COURT:  I see.  You may step down.
 6              AGENT HUNT:  Thank you.
 7              THE COURT:  Mr. Mangels, any other witnesses or
 8    evidence?
 9              MR. MANGELS:  No, Your Honor, thank you.
10              THE COURT:  Mr. Acosta, any other witnesses or
11    evidence?
12              MR. ACOSTA:  No witnesses or evidence, Your Honor.
13              THE COURT:  Let me hear argument, please.
14              MR. MANGELS:  Yes, Your Honor, thank you.
15         To begin, Your Honor, this is not a special hearing.  To
16    the extent there may or may not be issues with the interview of
17    the Defendant is not relevant to the probable cause.
18              THE COURT:  For purposes of argument, I will give
19    Counsel some leeway on that.  Let's stick to what the elements
20    are for this particular offense as it is charged.
21              MR. MANGELS:  Absolutely, Your Honor.  He was
22    discounting the statements of the Defendant though.  Look at
23    the statements of TOG.  He stated his sister paid money to an
24    unknown smuggler to bring them from Honduras and paid the
25    Defendant $1,500 to get them into the United States and an
```

1    additional thousand dollars was paid to the Defendant for her

2    to give to another smuggler.

3        The Defendant presents at the port of entry claiming asylum

4    claiming they are all minors and all related to her.  Further

5    investigation reveals that one of them is not a minor and was,

6    in fact, trying to get in under false pretenses.  He admitted

7    he was not trying to get to the United States for purposes of

8    political asylum but to find work.

9            THE COURT:  That's TOG.

10           MR. MANGELS:  That's TOG.  In addition, three of the

11   other minors, one of the other children is related to her, and

12   the other three are not related to her in any way.  Presumably,

13   we can draw reasonable inference these are also illegal aliens

14   attempting to be smuggled into the United States by the

15   Defendant.

16           THE COURT:  Is there anything illegal about even if

17   she was paid money to bring them up, under 1324, is there

18   anything illegal about if she showed up and was paid money to

19   the bring them up here or shepherd them up here from

20   Central America and show up to the border and do something that

21   they were legally entitled to ask for?

22       Setting TOG aside, the other minors, if they showed up and

23   said you know what, we are all asking for asylum, is that

24   smuggling?  I don't think it is.

25           MR. MANGELS:  Probably not, Your Honor, because it

1    could be the nature of paying her for her services, paying her

2    to conduct individuals and provide them safe travel through

3    Mexico similar to if we hired someone in the United States like

4    if I hired a nanny or babysitter to watch my child and

5    potentially transferred them to another place; nothing illegal

6    about that.  The illegality comes in when she is presenting

7    these people under false pretenses.

8              THE COURT:  Certainly as to TOG.

9              MR. MANGELS:  Certainly as to TOG.

10             THE COURT:  You're saying there is false pretenses

11   also because she says --

12             MR. MANGELS:  These minor issues --

13             THE COURT:  Are related to me and certain facts that

14   might be material possibly about her relationship with those

15   minors?

16             MR. MANGELS:  Yes, Your Honor.

17        Again, we maintain that the claim of political asylum for

18   all of them is just a false pretense essentially buttressed by

19   the statement of TOG that he was just coming there to look for

20   work.

21             THE COURT:  It is not before us.  That may or may not

22   be.  Your issue here is the false pretense essentially.  That

23   creates the illegality here in trying to induce the people to

24   come in.

25             MR. MANGELS:  Yes, Your Honor.  She is essentially

1  presenting a false claim to admission which would basically

2  make these individuals illegal aliens because the claim they

3  are presenting, certainly with respect to TOG, is false.

4          THE COURT:  The testimony also was that she was aware

5  of this --

6          MR. MANGELS:  She was aware he was not a minor, she

7  was aware that there was no relation between them, that, again,

8  this money was being paid to her for purposes of smuggling him

9  into the United States.  So, all of that we maintain is

10 evidence of the illegality and proves the elements and

11 certainly for probable cause purposes.

12         THE COURT:  Thank you.

13    Mr. Acosta?

14         MR. ACOSTA:  Thank you, Your Honor.

15    Your Honor, I will ask the Court to pay close attention to

16 the testimony given and maybe go back into the record and

17 listen to what was said by the Agent.  I disagree with the

18 interpretation of the Prosecutor in what my client said or

19 didn't say.

20    Let me tell you the Agent in several locations when she is

21 asked about my client's entry, she is asked about relationship

22 with her son and the others were related, and she was going to

23 be reimbursed $5,000 to TOG's aunt.  She repeated it three or

24 four times.  All of a sudden is that she knew that TOG was not

25 17.

```
1              THE COURT:  We get that through TOG's statement.
2              MR. ACOSTA:  I will get to that part.  But because the
3    Government is saying my client is admitting to this.  I don't
4    think it was the testimony.  I will ask the Court to please
5    look into the transcript.  I think it is crucial to what my
6    client knows.
7         What we do know is that somebody said, we don't know who,
8    we don't know how, but somebody determined there was no
9    familial relationship.  Now, how did they find out, how did
10   they check?  Isn't she the aunt like the Government is
11   admitting there is a [inaudible] relationship with TOG
12   supposedly and we have the admission by the Prosecutor.  What
13   about the other ones?  How did they make the determination?
14   Nobody knows.  It is secret.
15        There was a supposed determination, but she is traveling
16   from Honduras all the way here to the border.  Now, the
17   Government is saying there was a false claim to admission.
18   That's a different charge than what we have here.  That's not a
19   1324 smuggling.  That's a different claim.  If they want to
20   charge my client with a false claim for admission, that's not
21   what was presented to this Court.  If it is going to be a false
22   statement about the relationship with the other minors, that is
23   a different charge than what is being presented to this Court.
24   That is not what we are presented with.
25        Here the Government is saying my client is a smuggler that
```

1   she was hired or she was smuggling five individuals, four or

2   whatever it is.  That was her job.  They didn't testify that at

3   the time they get to the port of entry they are following the

4   law.  The only way my client and those individuals had asked

5   for political asylum is by going to the bridge which is what

6   [inaudible] testified to the last question.  My client

7   [inaudible] political asylum maybe after she gets arrested but

8   not there because there has to be a port director.  It is why

9   it is important they went to the bridge.

10      I also asked the Agent whether or not she was violating the

11   law by asking for the other individuals whether she is a minor

12   or not for political asylum.  She was not violating the law at

13   all.  There is no smuggling in this case.  There is no probable

14   cause, and there is no evidence there was any smuggling.

15      Let's assume it is not true she was related to the minors.

16   That doesn't matter.  That is not one of the things that is

17   looked at for political asylum.  There is no evidence that is

18   one of the things that was looked at for political asylum.  It

19   doesn't matter at all.

20          THE COURT:  Your argument is if this was charged as --

21   even not even under 1324 statute, but charged as aiding and

22   abetting a 1546 that possibly is closer to or matches up a

23   little better with the facts.

24          MR. ACOSTA:  To what it is trying to be precise in

25   this case.  You have to remember that the interview with TOG is

1   conducted by Officer Jalot, and they are using the term

2   "smuggling."  We haven't heard those terms being used in

3   Spanish.  That is very interesting to me.  I don't know it is

4   [inaudible] with me or they are going to hide me and bring me

5   illegally into the US.  We don't know that.  That was not even

6   part of the evidence.

7       At this point, Your Honor, and I really ask the Court to

8   look into what was actually said and what the Prosecutor

9   believes was said because there is absolutely zero evidence of

10  any smuggling.  We have a legal act that was committed which

11  was go to the bridge and ask for political asylum for herself

12  and the other individuals that were with her.

13      According to the Government, there was a false statement,

14  not a false claim because they never claimed to be a US

15  citizen.  There is not a code or violation of the law that says

16  you made a false claim for political asylum.  There is no

17  violation like that in our federal criminal code.  What

18  [inaudible] have been a false statement, that's what they are

19  saying she committed, a false statement, showing she is related

20  or not related.  We don't know.  That is supposed to be the

21  claim, a false statement at a port of entry.

22      Was it a false statement to secure entry or there is no

23  evidence or testimony that for political asylum you have to be

24  related to the people you come into for this [inaudible].

25              THE COURT:  I'm not focused on that issue or on that

1    specific issue.  Anyway, go ahead.

2         MR. ACOSTA:  So, Your Honor, I really believe this

3    case has absolutely no evidence as to smuggling.  There is no

4    probable cause in this case, and I'm asking the Court to

5    consider the actual evidence that came in from the Agent who

6    reviewed the evidence because I really don't believe the

7    Government has a case anywhere here.

8         Thank you, Your Honor.

9         THE COURT:  Thank you.

10    Factually, it certainly is a different case, unusual case.

11    1324 is just this kind of anaconda of the statute.  You can

12    charge a number of different smuggling offenses under 1324, but

13    here they charged 8 U.S.C. 1324(a)(1)(a)(4) and (a)(1)(b)(2),

14    encouraging and inducing an alien to come to, enter, and reside

15    in the United States knowingly and in reckless disregard of the

16    fact that such coming to entry and residence is and will be in

17    violation of the law.

18    Now, I am not making any kind of statement as to whether

19    this is what the Government picked to charge the offense, but I

20    think TOG's statement is enough to get you over probable cause

21    in terms of the material misrepresentations that were made

22    about his age and about the relationships and what he

23    attributed the Defendant knew which would certainly be in

24    violation of the law.

25    So, the way I construe this is there is probable cause to

1    find that an alien had been encouraged or induced in violation

2    of the law given that there were false pretenses that there is

3    enough evidence for probable cause purposes to show that the

4    Defendant was aware of.  I do find probable cause, and I will

5    grant the Government's motion to detain.

6

7                              *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATION
                         _____
 2

 3       I certify that the foregoing is a correct transcript from

 4   the record of proceedings in the above-entitled matter.   I

 5   further certify that the transcript fees and format comply with

 6   those prescribed by the Court and the Judicial Conference of

 7   the United States.

 8

 9   Date:   February 5, 2018

10                                   /s/ Walter A. Chiriboga, Jr.
                                     _____
11                                   Walter A. Chiriboga, Jr.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```